**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JOYCE BONCHER**,<br><br>Plaintiff,<br><br>V.<br><br>**3M COMPANY and ARIZANT HEALTHCARE, INC.**, ***et al.***,<br><br>Defendants. | **Case No. <u>5:24-cv-01403-JMG</u>** |

**<u>PLAINTIFF'S FIRST AMENDED COMPLAINT</u>**

1. Plaintiff Joyce Boncher, by and through her attorneys of record, files this First Amended Complaint against 3M Company, and for causes of action would respectfully show the Court the following:

## I. <u>PARTIES</u>

2. Plaintiff Joyce Boncher ("Ms. Boncher" or "Plaintiff") is a resident and citizen of the State of Pennsylvania and claims damages as set forth below.

3. Defendant 3M Company ("3M" or "Defendant") is a corporation incorporated in the State of Delaware and has its principal place of business in Maplewood, Minnesota. 3M Company's resident agent for service of process is CT Corporation System Inc., which is located at 100 South Fifth Street, Number 1075, Minneapolis, Minnesota 55402 in Hennepin County.

4. Defendant Arizant Healthcare, Inc. ("Arizant") is a corporation organized and existing under the laws of Delaware. Arizant is a wholly owned subsidiary of 3M and conducts business throughout the United States.

## II. JURISDICTION AND VENUE

5. Jurisdiction is proper based upon diversity of Citizenship.

6. Venue is proper in the U.S. District Court for the Eastern District of Pennsylvania, where this case was properly transferred by the MDL Court.

## III. PRODUCT AT ISSUE

7. Plaintiff incorporates by reference all the above Paragraphs as if set forth fully herein.

8. The immediate lawsuit involves the use of the Bair Hugger Warming Blanket device ("Bair Hugger") which was designed, manufactured, tested, inspected, marketed, distributed, and sold by Defendant 3M.

9. On August 22, 2018, the Bair Hugger device was used during Plaintiff's surgical procedure performed at Coordinated Health - Bethlehem located at 2300 Highland Avenue, Bethlehem, Pennsylvania 18020.

10. The Bair Hugger device was leased by, and subject to service and maintenance by, Coordinated Health prior to the surgical procedure which was performed on Plaintiff.

## IV. FACTUAL BACKGROUND

11. Plaintiff incorporates by reference all the above Paragraphs as if set forth fully herein.

**PLAINTIFF'S INJURIES**

12. Plaintiff Joyce Boncher underwent surgery on August 22, 2018 at Coordinate Health. A Bair Hugger device was used to keep parts of the Plaintiff's body warm during that surgical procedure.

13. The surgical procedure was performed by orthopedic surgeon Brett P. Godbout, M.D.

14. Contaminants introduced into Plaintiff's open surgical wound as a direct and proximate result of use of the Bair Hugger during the subject surgery resulted in Plaintiff developing a periprosthetic joint infection ("PJI"), also known as a deep joint infection ("DJI").

15. From 2018 to 2019, Plaintiff dealt with chronic infection issues requiring numerous treatments, medications, surgical procedures, and causing persistent pain and discomfort.

**HISTORY OF THE BAIR HUGGER**

16. The first Bair Hugger device was originally developed by Augustine Medical Inc. in the 1980's and was expressly intended for use only *outside* an operating room.

17. Augustine Medical Inc. submitted the Bair Hugger Model 200 for 510(k) clearance by the Food and Drug Administration ("FDA"), claiming that it was substantially equivalent to the Sweetland Bed Warmer and Cast Dryer.

18. The 510(k) for the Bair Hugger Model 200 expressly *excluded* use in the operating room.

19. In 1988, Augustine Medical received 510(k) clearance to market the Bair Hugger Model 500.

20. The 510(k) for the Bair Hugger Model 500 *expressly excluded use in the operating room*.

21. The Bair Hugger Model 500OR was introduced to the market in or around 1993.

22. There was never a 510(k) application for the Bair Hugger Model 500OR.

23. There was never a 510(k) clearance for the Bair Hugger Model 500OR.

24. The warning regarding airborne contamination was removed from the Bair Hugger Model 500OR, without the knowledge or consent of the FDA.

25. Augustine Medical Inc. marketed and sold the Model 500OR for use *inside* the operating room.

26. Augustine Medical never informed the FDA that the intended use of the Bair Hugger device changed to include use inside the operating room.

27. Expanding the indications for use of the Model 500OR to include use in the operating room is a major change in the indications for use. The FDA was never informed of this major change in indications for use of the Model 500OR.

28. In 1996, Augustine Medical, Inc. received 510(k) clearance to market the Bair Hugger Model 505.

29. The 510(k) application for the Model 505 claimed substantial equivalence to the Model 250 and Model 500. Both the Model 250 and Model 500 were expressly for use *outside* the operating room.

30. Two years later, Augustine Medical received 510(k) clearance to market the Bair Hugger Model 750.

31. Augustine Medical informed the FDA that there was no change to the intended use from the Model 500 to the Model 505.

32. When Augustine Medical, Inc. reorganized in or around 2003, the division of the company that retained the Bair Hugger product line became Arizant.

33. In 2004, Citigroup Venture Capital purchased Arizant for $225 million.

34. In 2010, 3M purchased Arizant, and all rights to the Bair Hugger product line, for $810 million.

35. 3M also purchased all the liabilities associated with the Bair Hugger.

36. 3M is responsible for the conduct of Arizant as it relates to the Bair Hugger.

37. 3M is responsible for the conduct of Augustine Medical, Inc. as it relates to the Bair Hugger.

38. Defendant 3M, and its predecessors, designed, developed, tested, packaged, manufactured, promoted, marketed, distributed, leased, supplied and/or sold a variety of Bair Hugger models, including but not limited to the Bair Hugger 505, 750, and 775.

**USE OF BAIR HUGGER IN THE OPERATING ROOM**

39. More than 50,000 Bair Hugger units are currently in use across the country.

40. Bair Hugger blankets cover all, or part, of a patient's body. Others are positioned under the patient allowing full access to the patient during surgery.

41. The Bair Hugger consists of a portable heater, or blower, connected by a flexible hose to a disposable blanket that is placed over (or in some cases under) surgical patients. The Bair Hugger intakes air from the surrounding area (often from the non- sterile floor of the operating room) and passes it through the intake filter and internal air pathways of the machine and into an outlet hose. The warm air travels through the distal end hose, which does not have an air filter, and into the blanket, which has different compartments through which the warm air moves. The warm air exits the blanket through multiple holes over a patient's exposed skin.[1]




---

1 *See image from* 3M Product Catalog, https://www.3m.com/3M/en_US/p/d/b00042332/ (last visited Mar. 23, 2023).

42. While warm air accumulates under the surgical drape covering the patient, the air escapes from multiple places. Not all of the hot air produced by the Bair Hugger remains under the surgical drape, however. Much of the hot air escapes from under the surgical drape below the level of the surgical table or at the head end of the surgical table. The escaped air then creates convection currents that flow against the downward airflow of the operating theater.

43. Scientific studies have shown that as this warmed air rises against the downward airflow in the operating room, the warm air interferes with the downward flow of air and carries particles from the non-sterile portions of the operating theater to the sterile surgical filed and surgical site.

44. Some particles carry bacteria.

45. Scientific studies have also shown that the inadequate air filtration system of the Bair Hugger allows pathogenic-carrying cells, including but not limited to isolates of *S aureus*, coagulase-negative *staphylococci* ("CoNS"), and methicillin-resistant *staphylococcus aureus* ("MRSA"), to penetrate the intake filter of the device and colonize inside the device.

46. The Bair Hugger itself generates airborne contamination that significantly increases the risk of infection for patients undergoing surgeries of all kinds.

47. As the device sits on or near the floor of the operating theater, often directly next to the operating table, it intakes large quantities of desquamated skin cells and other viable microorganisms that have been pushed down to the non-sterile floor of the operating theater. Because the internal surfaces of the device cannot be easily cleaned or decontaminated, and the operating instructions for the device do not provide a method for cleaning or decontaminating the inside of the device, microorganisms build up and colonize therein. Without an adequate filtration

system at the distal hose outlet, the device releases contaminants into the operating theater and directly onto the patient and/or surgical site itself.

48. For at least two decades, Defendant has known that the Bair Hugger emits significant levels of internally generated airborne contaminants into the operating theater and that the exhaust generated thereby creates convective airflow patterns that disrupt the unidirectional airflow of the operating theater, dramatically increasing the risk of infection for patients undergoing lengthy surgeries, especially hip and knee replacement surgeries.

49. One scientific study concluded that the Bair Hugger emits up to 35,000 particles per cubic foot downstream of its intake filter; another study found that the Bair Hugger releases up to 110,000 particles per cubic foot downstream of its filter, which translates to more than 80,000 particles per second being emitted from the distal end hose of the Bair Hugger. Defendant 3M admits, *every study* that it is aware of shows that using the Bair Hugger in an operating room increases the number of particles over the surgical site.

50. In a deposition on April 14, 2022, Defendant 3M's corporate designee agreed that "3M is aware that every single study that looked at this issue shows an increase of particulates in absolute numbers when the Bair Hugger is used, correct?"

51. After those particles and other bacteria are expelled from the interior of the Bair Hugger by an outward airflow, they travel into the warming blanket, escape from the holes in the blanket, and land directly onto the surgical site, thereby infecting patients.

52. Defendant 3M, and its predecessors, marketed the Bair Hugger to healthcare providers as being able to "meet [their] every day and specialized patient warming needs– from pediatric to geriatric [and] from brief outpatient procedures to long complex procedures."

53. The Bair Hugger's marketing slogan once stated, "Everyone Deserves a Hugg," despite the fact that the Bair Hugger is neither safe nor effective for use in general or orthopedic surgeries and, to this day, has never been tested for use in orthopedic surgery.

54. In over three decades, Defendant never evaluated the risks associated with use of the Bair Hugger in total knee or hip replacement surgeries despite marketing the Bair Hugger for use in those surgeries.

55. In June 1997, in sworn filings submitted to the FDA in connection with Section 510k of the Food and Drug Act, Defendant admitted that "[a]irborne contamination from air blown intra-operatively across the surgical wound may result in airborne contamination."[2]

56. Thus, certainly no later than 1997, Defendant knew that airborne contamination from air blown intra-operatively across the surgical wound may result in airborne contamination.

57. Defendant continues to misrepresent that Bair Hugger blankets are designed for intraoperative application and are safe for use during surgical procedures.[3]




---

[2] *See* 510(k) Summary of Safety & Effectiveness for the Bair Hugger Patient Warming System, Model 525 Blanket (K903360) (June 26, 1997), https://www.accessdata.fda.gov/cdrh_docs/pdf/K964673.pdf.
3 See 3M Product Catalog, https://www.3m.com/3M/en_US/p/d/b00042332/ (last visited Mar. 23, 2023).

58. Defendant addressed the fundamental defect in the Bair Hugger by making additional misrepresentations to the FDA that they had remediated that particular design defect by employing a tape barrier in all Bair Hugger models and that such a barrier would “prevent air from migrating toward the surgical site.”

59. This statement to the FDA was false and misleading and remains uncorrected to this day.

60. Despite Defendant 3M’s admission that all internal and external testing shows that when turned to “warm”, the Bair Hugger increases particles at the surgical site, 3M and its predecessors have refused to warn physicians.

61. On the issue of warning, Defendant 3M’s corporate designee testified as follows in April of 2022:

> Q. Until this day, 3M does not warn that the Bair Hugger may increase the amount of particulates over the sterile field, correct?
>
> A. That's correct.

62. In fact, Defendant 3M and its predecessors have taken every step imaginable to conceal and discredit peer-reviewed scientific studies that undermine their ability to market the Bair Hugger.

63. Notwithstanding their knowledge of that risk and the availability of safer alternative designs, Defendant actively and aggressively markets the Bair Hugger as safe for use inside the operating room.

64. Defendant also misrepresented that the air filtration system of the Bair Hugger satisfied High Efficiency Particulate Air (“HEPA”) standards. Though Defendant touted the Bair Hugger as HEPA compliant to healthcare providers and informed the FDA of the same, the Bair

Hugger has never met that standard. To qualify as HEPA-compliant, an air filter must remove at least 99.97% of all particles 0.3 micrometers or larger from the air that passes through it. Upon information and belief, the Bair Hugger Model 750 filter removes no more than 63.8% of particles 0.3 micrometers or larger.

65. Upon information and belief, at some point between 2002 and 2009, Defendant significantly reduced the efficiency of the Bair Hugger's air filtration system.

66. As a result of that decision, the internal airflow pathways of the Bair Hugger become contaminated with pathogens, including isolates of CoNS, mold, and other bacteria, which incubate and proliferate therein. And since the defective design of the device does not include an outlet filter - let alone a HEPA-complaint filter - the Bair Hugger releases contaminants into the operating theater and onto the surgical site.

67. Leaks around the filter on the intake side of the Bair Hugger and inadequate air intake filtration can and do lead to buildup of microbial contamination, including isolates of CoNS, mold, and other bacteria, which incubate and proliferate in the internal passageways of the Bair Hugger and adjoining hose. At least one scientific study has revealed the presence of viable microorganisms in 100% of Bair Huggers, with the heaviest growth reported on the internal air path surfaces of the "elbow" of the Bair Hugger.

68. Upon information and belief, Defendant 3M and its predecessors have been aware of the pathogenic contamination of the internal airflow pathways of the Bair Hugger since at least as early as 2009 due to the contemporaneous publication of scientific studies identifying these issues.

69. Rather than address the problem and alter the design of the Bair Hugger, Defendant 3M, and its predecessors, callously and with conscious disregard for patient safety, instead chose to amplify their efforts to champion the Bair Hugger and to silence its critics.

70. Despite their knowledge, Defendant 3M, and its predecessors, continue to market the Bair Hugger to consumers and healthcare providers; to misrepresent the safety of the Bair Hugger in their advertisements, statements to healthcare providers, and/or submissions to the FDA; and to place the defective product into the stream of commerce.

**SCIENTIFIC STUDIES REVEAL BAIR HUGGER ISSUES**

71. Further, at all times relevant herein, Defendant 3M, and its predecessors, knew - or should have known - that the Bair Hugger emits significant levels of internally generated airborne contaminants into the operating theater and that the exhaust generated thereby creates convective airflow patterns that disrupt the unidirectional airflow of the operating theater, dramatically increasing the risk of infection for patients undergoing lengthy surgeries, especially hip and knee replacement surgeries.

72. In the face of that research, and safer alternative designs created by competitors, Defendant 3M continues to extol the benefits of the Bair Hugger to the public and healthcare providers. In a communication that appeared in HEALTHCARE PURCHASING NEWS in July 2012, for instance, Defendant's public relations and communications specialist Greta Deutsch averred: "[S]ome conductive-warming manufacturers have alleged that forced-air warming increases bacterial contamination of operating rooms or interrupts laminar airflow. These accusations have no factual basis."[4]

[4] *See* Cantrell, Susan, *Normothermia Reduces Infection*, HEALTHCARE PURCHASING NEWS (July 2012), http://www.hpnonline.com/inside/2012-07/1207-OR-TempMgmt.html.

73. Consistent with Defendant' prior misrepresentations, Ms. Deutsch's assertion ignored numerous studies documenting the adverse effects of the Bair Hugger.

74. These peer-reviewed publications include but are not limited to:

a. Albrecht, M., *et al*. Forced-air warming blowers: An evaluation of filtration adequacy and airborne contamination emissions in the operating room. *Am J Infect Control* 2011; 39:321-28;

b. Leaper, D., *et al*. Forced-air warming: A source of airborne contamination in the operating room? *Orthopedic Rev*. 2009;1(2): e28;

c. McGovern, P., *et al*. Forced-air warming and ultra-clean ventilation do not mix. *J Bone and Joint Surg-Br.* 2011;93(11):1537-44;

d. Legg, A., *et al*. Do forced air patient-warming devices disrupt unidirectional downward airflow? *J Bone and Joint Surg-Br*. 2012;94-B:254-56;

e. Belani, K., *et al*. Patient warming excess heat: The effects on orthopedic operating room ventilation performance. *Anesth Analg.* 2013;117(2):406-11;

f. Dasari, K., *et al*. Effect of forced air warming on the performance of operating theatre laminar flow ventilation. *Anaesthesia* 2012; 67:244-49;

g. Avidan, M., *et al*. Convection warmers—not just hot air. *Anaesthesia* 1997; 52:1073-76;

h. Bernards, A., *et al*. Persistent *Acinetobacter baumannii*? Look inside your medical equipment. *Infect Control Hosp Epidemiol.* 2004; 25:1002-04;

i. Brandt, S., *et al*. Resistive-polymer versus forced-air warming: comparable efficacy in orthopedic patients. *Anesth Analg.* 2010; 110:834-38;

j. Kimberger, O., *et al*. Resistive polymer versus forced-air warming: comparable heat transfer and core rewarming rates in volunteers. *Anesth Analg.* 2008; 107:1621-26;

k. Legg, A., *et al*. Forced-air patient warming blankets disrupt unidirectional airflow. *Bone Joint J.* 2013;95-B:407-10;

Case 6:24-cv-01493-JMG Document 1-6 Filed 09/12/24 Page 13 of 48

l. Matsuzaki, Y., *et al*. Warming by resistive heating maintains perioperative normothermia as well as forced air heating. *Bn J Anaesth.* 2003; 90:689-91;

m. Negishi, C., *et al*. Resistive-heating and forced-air warming are comparably effective. *Anesth Analg.* 2003; 96:1683-87;

n. Ng, V., *et al*. Comparison of forced-air warming and electric heating pad for maintenance of body temperature during total knee replacement. *Anaesthesia* 2006; 61:1100-04;

o. Reed, M., *et al*. Forced-air warming design: evaluation of intake filtration, internal microbial buildup, and airborne-contamination emissions. *Am Assoc Nurse Anesth. J* 2013; 81:275-80;

p. Sigg, D.C., *et al*. The potential for increased risk of infection due to the reuse of convective air-warming/cooling coverlets. *Acta Anaesthesiol Scand.* 1999; 43:173-76;

q. Wood, A., *et al*. Infection control hazards associated with the use of forced-air warming in operating theatres. *J Hosp Infect.* 2014;1-9.

r. He X, Karra S, Pakseresht P, Apte SV, Elghobashi S. *Effect of heated-air blanket on the dispersion of squames in an operating room*. INT J NUMER METHOD BIOMED ENG. 2018 May;34(5): e2960. doi: 10.1002/cnm.2960. Epub 2018 Feb 20. PMID: 29316347; PMCID: PMC5969115t.

75. On April 17th, 2020, The Journal of Arthroplasty accepted an article titled "Prevention of Infections and Disruption of Pathogen Transfer Chain in Elective Surgery". The article focused on the diligent steps that needed to be taken in the operating theater in the face of the COVID-19 pandemic, and specifically cautions against the use of forced-air warming systems.

76. The contemporaneous publication of scientific studies identifying these issues and the availability of alterative designs should have prompted Defendant 3M, and its predecessors, to discontinue marketing, selling, and/or using the Bair Hugger until the Bair Hugger was redesigned to prevent the spread of bacterial contamination.

Case 6:24-cv-01493-JMC Document 163 Filed 09/12/24 Page 14 of 48

77. At a minimum, Defendant 3M, and its predecessors, should have warned patients of the known risk inherent in using the Bair Hugger in surgeries, where patients are at even greater risk of infection.

78. Instead, amid rising criticism of the Bair Hugger among the medical community, Defendant callously, and with conscious disregard for patient safety, chose to amplify their efforts to champion the device and silence its critics.

79. Defendant 3M has claimed there is no "consensus" that Bair Hugger causes PJI and that its status as the "most studied" warming device proves its safety. The published scientific literature tells a different story:

| **PUBLISHED STUDIES ON BAIR HUGGER** | |
|---|---|
| *Publication* | *Salient Language* |
| **Positive Epidemiologic Studies** | |
| McGovern 2011 | "A significant increase in deep joint infection, as demonstrated by an elevated infection odds ratio (3.8, p=0.024), was identified during a period when [Bair Hugger] was used compared to a period when conductive fabric was used." |
| **Negative Epidemiologic Studies** | |
| [None] | [None] |
| **Non-Epidemiologic Internal Contamination Studies & Articles** | |
| Avidan 1997 | "We conclude [Bair Huggers] are a potential source of nosocomial infection." |
| Baker 2002 | "[T]here seems insufficient evidence to justify the routine use of forced air warming units … during ultraclean orthopedic surgery." |
| Bernards 2004 | "[T]he outbreak strain was transmitted by being carried on contaminated dust from within [Bair Hugger] to the exterior during operation when a fan created an air current." |

| | |
|---|---|
| Beavers 2007 | "<u>Previous outbreaks</u> have found items such as … Bair Hugger temperature management units … to be <u>reservoirs of infection</u>." |
| Gjolaj 2009 | "A potential disadvantage is that the BH may blow contaminated air." |
| Albrecht 2009 | "Particulate emissions from [Bair Huggers] could, conceivably, be deposited onto the surgical site." |
| Albrecht 2011 | "Fifty-eight percent of the [Bair Huggers] evaluated were internally generating and emitting airborne contaminants, with microorganisms detected on the internal air path surfaces of 92.3%." |
| Reed 2013 | "Swabbing detected microorganisms within 100% of the [Bair Hugger] blowers [and] . . . 96% of [them were] emitting significant levels of internally generated airborne contaminants." |
| Tsai 2016 | "<u>Documented complications</u> from FAW use include an <u>increased incidence of surgical site infections</u>." |
| Buck 2017 | "Bair Hugger causes an increase in the number of particles … in close proximity to the surgical site." |
| ECRI 2017 | "A warming unit should have HEPA-grade or better air filters to reduce the risk that airborne dust, bacteria, and mold will be blown onto the patient or into wounds." |
| Lange 2019 | "Forced-air warming (FAW) devices … can introduce bacteria into the surgical environment, <u>increasing</u> both possible <u>contamination</u> and attributable Surgical Site <u>Infection (SSI) risks</u>." |
| Lange 2022 | "the Bair Hugger is contributing airborne microbes into the [operating room] air" in a "statistically significant way."  particles in close proximity to the patient and surgical site should not be underestimated." |

| | |
|---|---|
| Sugai 2018 | Noting the "US Centers for Disease Control and Prevention recently issued a warning: 'Nothing that blows air should be in an operating theater, if possible'", the authors note the "clinical concern [of disruption of the operating room airflow and contamination of the surgical field] is especially severe in implant surgery where a single airborne bacterium can cause an infection," the authors conclude "identifying an effective air-free alternative is paramount." |
| **Non-Epidemiologic Airflow Disruption Studies & Articles** | |
| Tumia 2002 | "[Finding] rise in the number of colony forming units between warmer off and warmer on." |
| Moretti 2009 | "In the 20 procedures in which the Bair Hugger was used, the mean bacterial load values were significantly increased." |
| McGovern 2011 | "[Bair Hugger] generated convection currents that mobilized floor air into the surgical site area." |
| Legg 2012 | "[Bair Hugger] resulted in a significant mean increase in the temperature . . . and number of particles . . . over the surgical site." |
| Dasari 2012 [A1166] | "[Bair Hugger] generates convection current activity . . . disrupt[ing] ventilation airflows intended to clear airborne contaminants from the surgical site." |
| Legg 2013 | "The convection currents increased the particle concentration 1000-fold . . . by drawing potentially contaminated particles from below the operating table into the surgical site." |
| Belani 2013 | "[Bair Hugger] was found to establish convection currents that mobilized resident air from nonsterile areas … into the surgical site." |
| Wood 2014 | "We conclude that FAW does contaminate ultra-clean air ventilation." |
| He 2017 | "[Bair Hugger] can potentially lead to surgical site contamination in 2 ways." |

| | |
|---|---|
| Jain 2019 | "[Forced-air warming devices] were associated with substantially higher numbers of simulated particles over the operative field and <u>substantially higher rates of post-operative PJI</u>." |

**BAIR HUGGER PROVIDES NO BENEFIT TO THE VAST MAJORITY OF PATIENTS**

80. Simultaneous to telling the medical community that the Bair Hugger was safe and effective, Defendant 3M was aware that the device provides no benefit to the vast majority of patients.

81. The Bair Hugger provides no benefit to obese patients. In April of 2022, 3M testified to the following regarding the Bair Hugger being useless for obese patients:

> Q. All right. And you know that in 2018, in the initial draft of the ERAS sort of best practices recommendation, they suggested not using force-air warming anymore, fair?
>
> A. So ERAS is a group of surgical specialties, and I think they're up to about, I don't know, 16 of them now, something like that; so orthopedics, cardiac, gynecological, breasts, neuro. And each one of those surgical specialties writes its own ERAS protocol; there are numerous ERAS protocols. And so whenever I present on ERAS, I have a comprehensive chart that shows which surgical specialty recommends the use of warming. So, for example, bariatric surgery, they don't recommend any warming at all.
>
> Q. Okay. Is that because it's a dirty surgery or what?
>
> A. No, it's because obese people don't get cold in surgery, so obesity is protected from hypothermia. But then, you know, almost all of the other specialties - I think there's one other specialty that doesn't recommend it. But all of the other ERAS surgical specialties, the vast majority of them, recommend warming and forced-air warming.
>
> Q. So if obese patients don't get cold, is there a warning or a precaution on the Bair Hugger at all saying you don't need to use this with obese patients?
>
> A. No.

Q. Why is that?

A. Well, it's not contraindicated. It's just not indicated, because it's not necessary.

Q. But also if a patient isn't going to become cold because they are obese, there's also no benefit to using the Bair Hugger, fair?

A. Yes, I would agree with that.

Q. And the only thing that the Bair Hugger does, and we can debate about whether it's important or not clinically, but the only thing that the Bair Hugger does is warm a patient?

A. Yes.

Q. So it's providing no benefit to those patients?

A. For obese patients. And again, we always recommend, regardless, that patients have their core temperature monitored throughout a procedure. So if they have absolutely normal core temperature intraoperatively, there would no reason to warm them.

Q. All right.

A. And that's pretty typical of an obese patient.

82. Despite this knowledge, Defendant 3M never informed the medical community that the Bair Hugger should not be used on patients who are deemed medically obese.

83. Defendant 3M and its employees have testified that for surgeries with very low complication rates, the evidence for forced air warming is exceedingly hard to justify.

84. Despite this knowledge, Defendant 3M has never informed the medical community that the Bair Hugger should not be used in surgeries with very low complication rates.

85. In May 2022, Defendant 3M's key opinion leader, Dr. Sessler, published a randomized controlled trial (PROTECT Study) that undermines virtually all benefits 3M claims are associated with maintaining normothermia - the only purpose of Bair Hugger.[5]

86. PROTECT validates conclusions already reached internally at 3M regarding scientifically invalid support for the marketing claims that 3M continues to make to this day. Internal 3M documents confirm the company knew, no later than 2019, that there is no current valid support for claims that patient warming results in clinical benefits for patients ranging from decreased infection to decreased morbid cardiac events to decreased need for mechanical ventilation or shorter stays in the ICU.

87. The PROTECT study was well known to Defendant 3M, as it was a principal funder for over two years, until 3M revoked funding half-way through the project in an attempt to terminate the study.

88. Contrary to widely held beliefs and guideline recommendations, the PROTECT trial revealed that aggressive patient warming did not meaningfully decrease the risk of postoperative mortality or morbidity, including myocardial injury, non-fatal cardiac arrest, intraoperative bleeding, or surgical site infection, and there were no clinically meaningful differences between the two study groups in terms of adverse events.

89. Indeed, immediately following the PROTECT study, in the May 2022 edition of THE LANCET, a comment appeared reflecting on the import of the PROTECT study titled "*Challenging dogma about perioperative warming during non-cardiac surgery*".[6] In this comment, the authors note that PROTECT confirmed "active warming to maintain a temperature

[5] Daniel Sessler, MD, et al, *Aggressive intraoperative warming versus routine thermal management during non-cardiac surgery (PROTECT): a multicentre, parallel group, superiority trial*, THE LANCET (April 4, 2022).

[6] Flavia K Borges & Jessica Spence, *Challenging dogma about perioperative warming during non-cardiac surgery*, THE LANCET (April 4, 2022) (emphasis added).

of 37.0C did not improve postoperative outcomes." The authors go on to ask: "When considered in the context of current guidelines, these findings raise the question: *how did we get it so wrong*?"

90. But, of course, internal 3M documents confirm Defendant 3M already knew there was not current, valid scientific support for claims that warming results in clinical benefit to patients.

## V. **FRAUDULENT CONCEALMENT**

91. Through misrepresentations to the public, the medical community, and the FDA, Defendant 3M continues to actively conceal the fact that the Bair Hugger increases the risk of infection in all types of surgeries, especially orthopedic implant surgeries.

92. Defendant 3M continues to actively fraudulently conceal the risk associated with the Bair Hugger. Currently, 3M on its website states: "There is no conclusive evidence that the Bair Hugger system's forced-air warming causes infections" and "The bottom line: The Bair Hugger system is safe and effective."

93. Defendant 3M knows that assertion is false. In October of 2022, Defendant 3M's retained litigation expert, Dr. Jonathan Borak, who has been paid over $400,000 by 3M, testified live at trial as follows:

> Q. You cannot say that the Bair Hugger did not cause Ms. O'Haver's deep joint infection?
>
> A. Yes, I agree.
>
> ….
>
> Q. You're not aware of any testing that shows that the Bair Hugger is safe, true?
>
> A. I'm not aware of any evidence that it is safe.
>
> Q. Thank you. There is no evidence that the Bair Hugger does not increase the risk of deep joint infection, true?

A. There's no evidence that it does not.

….

Q. There's not evidence that the Bair Hugger was safe to use in the operation that Ms. O'Haver had when the Bair Hugger was used on her, true?

A. It's true.

94. Likewise, on another 3M funded website, it states: "There is no merit to any of those [Bair Hugger] lawsuits."

95. Defendant 3M knows that assertion is false as well. In reversing the federal MDL judge who had excluded Plaintiffs' experts and granted summary judgment, the 8th Circuit Court of Appeals held:

> In other words, the proposition that the increase in particles caused by the Bair Hugger includes bacteria-laden particles **<u>finds support in the record</u>**.
>
> The question for the MDL court was whether there was sufficient support in the factual basis for the experts' opinions that the Bair Hugger is capable of causing airflow disruption in a real-world operating room that transmits bacteria to the surgical site. The MDL court held that there was not. But, as we have just seen, **<u>there is significant support for the proposition that the Bair Hugger independently is capable of disrupting airflow so as to transmit bacteria to the surgical site</u>** when other airflow-disruptive variables are controlled for, and there also is empirical support for the proposition that those other variables can facilitate the Bair Hugger's airflow-disruptive effect in a real-world operating room.[7]

96. On its website, 3M claims a computational fluid dynamics ("CFD") study conducted by its paid expert, Dr. John Abraham, "rebut(s) claims from a competitor and a group of plaintiff attorneys that the warming system causes or increases the risk of surgical site infections

[7] *See Amador v. 3M Co. (In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.),* 9 F.4th 768 (8th Cir. 2021) (emphasis added).

by disrupting clean operating room airflow."

97. Defendant 3M knows this representation is false. In October of 2022, Dr. Abraham testified live at a trial in Independence, Missouri that it would be a stretch for 3M to claim his CFD study demonstrates that the Bair Hugger is safe.

98. On its website, Defendant 3M states "many professional bodies, clinical experts and governmental agencies, including the FDA, agree that no studies have shown an association between the use of a FAW system and increase in SSI."

99. Defendant 3M is aware the only epidemiologic study to study the issue, called the McGovern study, found a statistically significant association between the use of the Bair Hugger and increase in SSI. In fact, the study found a 380% increased risk of infection using the Bair Hugger over a different warming device. Longtime employee, Al Van Duren, testified in January of 2022 to the following:

> Q. McGovern looked at actual infection rates, correct?
>
> A. They did.
>
> Q. And it showed an increase in infection rates of 3.8 percent [sic] with the Bair Hugger versus conductive warming, correct? 3.8 fold?
>
> A. So that was a conclusion they drew from their data, yes.
>
> Q. So that is a 380 percent increased risk. That's what 3.8 fold means, correct?
>
> A. Well, 3.8 times, yes.

100. The McGovern study states the following:

The clinical concern regarding the formation of such convection currents is twofold. First, these currents oppose the natural clean airflow patterns that are intended to sweep contaminants down and away from the surgical site.[21] Thus, contaminants released in the vicinity of the surgical site are less likely to be cleared. Secondly, the upward mobilisation of floor-level and under-drape air could potentially compromise the sterility of the surgical site, as resident air from these locations is typically laden with pathogens shed from the surgical staff.[22] Either mechanism offers a plausible explanation for the significant association between the patient warming device and the risks of SSI in this study. Further, the types of organism iso-

101. In addition to false information on its websites, Defendant 3M continues to tamper with published literature to fraudulently conceal the defective condition of the Bair Hugger. 3M touts findings from the 2018 International Consensus on periprosthetic joint infections as evidence that the Bair Hugger is safe and effective. However, 3M fraudulently conceals two important facts.

102. First, the head of the International Consensus, Dr. Parvizi, was a paid consultant of 3M, who at the time had a contract for payment of $5,000 per day.

103. Second, 3M's paid litigation orthopedic surgeon expert, Dr. Michael Mont, who 3M has paid over $200,000 to defend the Bair Hugger, edited every single line of the International Consensus. Dr. Mont recently testified as follows:[8]

> Q. In fact, you testified that you went through every chapter, read every line, and edited every line of that International Consensus in 2018, right?
>
> A. Yes. I can say that I did not read every line if they offered a disclosure. So the printed word I reviewed. I didn't read everybody's disclosures if that's what you're asking me.

---

[8] *See* O'Haver 10/7/22 trial transcript at pg. 180:14-25.

Q. No, no, no. You read every line of the International Consensus document, correct, Doctor?

A. Correct.

Q. And you offered edits to almost every portion of that entire ICOS publication, right?

A. Yes.

104. Dr. Parvizi gave a copy of the draft International Consensus statement to 3M to review before it was published.[9]

105. One of 3M's attorneys, Corey Gordon, was provided an advance draft copy and emailed Dr. Mont asking him to make changes to the final Consensus statement.[10]

106. There is no disclosure in the final Consensus statement in the JOURNAL OF ARTHROPLASTY regarding a potential conflict or bias from Dr. Mont, Dr. Parvizi, or attempted influence from 3Ms MDL counsel.

107. Further, in an article published online, on October 30th, 2019, in the "Acta Orthopaedica"; the ERAS Society TKA/THA consensus statement noted "the use of forced air-warming blankets is not recommended as there is evidence that this is associated with increased risk of infection" (McGovern *et al*. 2011, Koc *et al*. 2017).[11]

108. At some point after the ERAS Society TKA/THA consensus statement was published, the statement was retracted and amended.

109. Defendant relies on what it claims is a CFD performed by Dr. Farhad Memarzadeh in 2010 as evidence the Bair Hugger has no impact on an operating room.

---

[9] *Id.* at 95:19-24.
[10] *Id.* at 95:25-96:10.
[11] Consensus statement for perioperative care in total hip replacement and total knee replacement surgery: Enhanced Recovery After Surgery (ERAS) Society recommendations", Acta Orthopedica (10/30/2019).

110. But Dr. Memarzadeh's unpublished CFD calculations were done not on a supercomputer but rather during an airplane flight.[12]

111. Further, much like the International Consensus, Dr. Memarzadeh sent 3M a draft of his "Letter to the Editor" before it was sent to the journal for publication.[13]

112. Internal emails confirm that Dr. Memarzadeh offered to highlight certain of his results while not disclosing other results and sought Defendant's endorsement of the approach.

113. Dr. Memarzadeh's letter to the editor was never a peer reviewed study.

114. Like Dr. Mont, Dr. Memarzadeh also never disclosed any conflicts or his relationship with 3M. Instead, Dr. Memarzadeh signed off on his Letter to the Editor noting his employment with the National Institute of Health. The implication seems to be it was an NIH sponsored study, but that is false.

**DEFENDANT 3M IS A SELLER OF THE BAIR HUGGER**

115. Defendant 3M and its predecessors developed a sales plan that utilized hospitals in the stream of commerce.

116. Under the sales model, Defendant 3M and its predecessors would lease the Bair Hugger warming unit for very low cost to the hospital and would sell the disposable warming blanket to the hospital for use in surgery.

117. The Bair Hugger blanket was not necessary to provide the treatment administered to Plaintiff and the surgical procedure that HCAH-Pearland provided could have, and should have, been provided *without* the use of the defective Bair Hugger device.

**PLAINTIFF'S INFECTION**

118. On or about August 22, 2018, Plaintiff Joyce Boncher underwent a total knee

[12] *See* O'Haver 10/3/22 trial transcript at pg. 141:16-142:16.
[13] *Id.* at pg. 141:21-23.

arthroscopy ("TKA"), a surgical procedure during which a Bair Hugger was used.

119. The surgical procedure was performed at Coordinated Health – Bethlehem by Dr. Brett P. Godbout, M.D.

120. Contaminants introduced into Plaintiff's open surgical wound due to the defects in the Bair Hugger during the subject surgery resulted in Ms. Boncher developing an infection that has impacted her life from that day to the present.

121. As a result of the infection, Plaintiff has undergone additional surgical procedures including irrigation and debridement procedures to rid the joint of the bacterial infection, prosthetic revision surgeries, and placement of an antibiotic spacer. She continues to be at risk for further complications.

## VI. CAUSES OF ACTION

### A. Count I: Negligence

122. Plaintiff incorporates by reference all the above Paragraphs as if set forth fully herein.

123. At all times relevant to this cause of action, Defendants were in the business of designing, developing, setting specifications, manufacturing, marketing, selling, and distributing the Bair Hugger warming system.

124. Defendants designed, manufactured, marketed, inspected, labeled, promoted, distributed and sold the Bair Hugger device that was used during the Plaintiff's surgical procedure.

125. Defendants had a duty to exercise reasonable and prudent care in the development, testing, design, manufacture, inspection, marketing, labeling, promotion, distribution and sale of the Bair Hugger device to avoid exposing others to foreseeable and unreasonable risks of harm.

126. Defendants knew or reasonably should have known that the Bair Hugger device was dangerous or was likely to be dangerous when used in its intended or reasonably foreseeable manner.

127. At the time of sale of the Bair Hugger device, Defendants knew or should have known that using the Bair Hugger device as intended or in a reasonably foreseeable manner created a significant risk of infection, and a patient suffering such an infection would endure severe health side effects, including, but not limited to: revision surgeries; irrigation and debridement procedures; placement of antibiotic spacers; amputation of limbs; and other severe personal injuries which are permanent in nature, including, but not limited to, death, physical pain and mental anguish, scarring and disfigurement, diminished enjoyment of life, continued medical care and treatment due to chronic infection proximately caused by the device; and, the continued risk of requiring additional medical and surgical procedures, including general anesthesia, with attendant risk of life threatening complications.

128. Defendants knew or reasonably should have known that consumers of the Bair Hugger device would not realize the danger associated with using the device in its intended use and/or in a reasonably foreseeable manner.

129. Defendants breached their duty to exercise reasonable and prudent care in the development, testing, design, inspection, marketing, labeling, promotion, distribution, and sale of the Bair Hugger device in, among others, the following ways:

a. Designing and distributing a product which they knew or should have known that the likelihood and severity of potential harm from the product exceeded the burden of taking safety measures to reduce or avoid harm;

b. Designing and distributing a product in which they knew or should have known that the likelihood and severity of potential harm from the product exceeded the likelihood of potential harm from other devices available for the same purpose;

c. Failing to use reasonable care to warn or instruct, including pre- and post-sale, Plaintiff, Plaintiff's physicians, Plaintiff's agents or the general healthcare community about the Bair Hugger device's substantially dangerous condition or about facts making the product likely to be dangerous;

d. Failing to perform reasonable pre- and post-market testing of the Bair Hugger device to determine whether or not the product was safe for its intended use;

e. Failing to provide adequate instructions, guidelines, and safety precautions, including pre- and post-sale, to those persons to whom it was reasonably foreseeable would prescribe, use, and operate the Bair Hugger device;

f. Advertising, marketing, and recommending the use of the Bair Hugger device, while concealing and failing to disclose or warn of the dangers known by Defendants to be connected with and inherent in the use of the Bair Hugger device in operating rooms;

g. Representing that the Bair Hugger device was safe for its intended use when in fact, Defendants knew and should have known the product was not safe for use in operating rooms;

h. Continuing to manufacture and sell the Bair Hugger device with the knowledge that the product was dangerous and not reasonably safe; and

i. Failing to use reasonable and prudent care in the design, research, and development of the Bair Hugger device to avoid the risk of serious harm associated with its use during surgical procedures.

130. A reasonable manufacturer, distributor, or seller under the same or similar circumstances would not have engaged in the aforementioned acts and omissions.

131. As a direct and proximate result of the foregoing negligent acts and omissions by Defendants, Plaintiff has suffered and will continue to suffer serious physical injuries and sever pain, impairment, disability, economic loss, loss of earning capacity, loss of enjoyment of life, expense of hospitalization, medical care and treatment, and other losses in an amount to be determined at trial.

Case 6:25-cv-01497-JNE Document 16-3 Filed 01/22/26 Page 29 of 48

**B. <u>Count II: Failure to Warn</u>**

132. Plaintiff incorporates by reference all the above Paragraphs as if set forth fully herein.

133. Defendants designed, manufactured, assembled, marketed, labeled, distributed, and sold the Bair Hugger device, including the one used during Plaintiff's procedure, into the stream of commerce and in the course of same, directly advertised and marketed the device to consumers or persons responsible for consumers.

134. At the time Defendants designed, manufactured, marketed, labeled, distributed, and sold the device, placing it into the stream of commerce, Defendants knew or should have known the device presented an unreasonable risk to users of the product when put to its intended and reasonably anticipated use. Specifically, Defendants knew or should have known that the Bair Hugger warming device posed a significant and increased risk of infection.

135. Consequently, Defendants had a duty to warn of the risk of harm associated with the use of the device and to provide adequate instructions on the safe and proper use of the device at the time that it was marketed.

136. Defendants knew that the Bair Hugger device was not intended for use in the operating room and was further aware of the serious risks associated with periprosthetic joint infections ("PJI").

137. Defendants failed to provide the warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm and in light of the likely seriousness of that harm.

138. Defendants failed to provide the post-marketing warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm and in light of the likely seriousness of that harm.

139. No healthcare provider, including Plaintiff's, patient or patient's agent would have used the device in the manner directed, had those facts been made known to the prescribing healthcare providers and/or ultimate users of the device.

140. The health risks associated with the device as described herein are of such a nature that an ordinary consumer would not have readily recognized the potential harm.

141. Plaintiff and Plaintiff's healthcare providers used the device in a normal, customary, intended, and foreseeable manner, namely as a warming device used during surgical procedure.

142. Therefore, the Bair Hugger device used during Plaintiff's surgery was defective due to a failure to warn because the product was distributed without sufficient warnings to notify the ultimate user of the dangers inherent in the product.

143. The Bair Hugger device used in Plaintiff's surgical procedure was in the same condition as when it was manufactured, inspected, marketed, labeled, promoted, distributed, and sold by Defendants.

144. Neither Plaintiff, nor Plaintiff's healthcare provider, were adequately warned or informed of the substantial risks associated with infection from use of the Bair Hugger device, nor of the potential devastating subsequent injuries that could result from such an infection.

145. Plaintiff would have avoided the risk of use of the Bair Hugger in her surgical procedure had she been warned of the risk by Defendants who provided the product to her surgeon and/or Coordinated Health Bethlehem.

146. As a direct and proximate result of Defendants' lack of sufficient warning and/or instructions, Plaintiff has suffered and will continue to suffer serious physical injuries and sever pain, impairment, disability, economic loss, loss of enjoyment of life, expense of hospitalization, medical care and treatment, and other losses in an amount to be determined at trial.

**C. <u>Count III: Design Defect</u>**

147. Plaintiff incorporates by reference all the above Paragraphs as if set forth fully herein.

148. At all times relevant to this action, Defendants developed, tested, designed, manufactured, inspected, labeled, promoted, sold, and distributed into the stream of commerce the Bair Hugger device, including the one used during Plaintiff's surgical procedure, claiming that it was safe and effective and intended to be a used intraoperatively.

149. The Bair Hugger device was expected to, and did, reach its intended consumers without substantial change in the condition it was in when it left Defendants' possession.

150. The Bair Hugger device was defective in design because it was constructed by Defendants in conformity with an intended design but the design itself was unreasonably dangerous to the consumer.

151. The Bair Hugger device used in Plaintiff's surgical procedure was defective in design because the foreseeable risks associated with the design exceeded the alleged benefits associated with the design.

152. The Bair Hugger device used during Plaintiff's surgical procedure was defective in design because its risks of harm exceeded its claimed benefits. Specifically, the Bair Hugger caused the infection suffered by Plaintiff.

153. Plaintiff and Plaintiff's healthcare providers used the Bair Hugger device in a manner that was reasonably foreseeable to Defendants.

154. Neither Plaintiff, nor Plaintiff's healthcare providers could have, by the exercise of reasonable care, discovered the device's defective condition or perceived its unreasonable dangers prior to Plaintiff's surgical procedure in which the Bair Hugger device was used.

155. Defendants' Bair Hugger device was defective in design as the design significantly increased the risk of infection by creating convection currents that circulated particles, including bacteria, in the surgical area of the operating room during its intended use.

156. Defendants' Bair Hugger device was defective in design because Defendants provided inadequate warnings to Plaintiff and her healthcare providers of the defect and/or dangerous propensity of the Bair Hugger device.

157. The Bair Hugger device by creating convection currents that flow against the downward airflow of the operating theater, significantly increased the risk of infection, which is an exceedingly dangerous flaw that Plaintiff would not have expected, nor would any reasonably prudent individual, despite using the Bair Hugger device precisely as it was intended.

158. Defendants had a duty to conform to a certain standard of conduct, particularly to not place into the stream of commerce a product, the Bair Hugger device, with a defect or dangerous propensity and/or to warn Plaintiff and her healthcare provider of the defect and/or dangerous propensity of the Bair Hugger device.

159. Defendants breached that standard of conduct.

160. Defendant was injured as a result of the breach and suffered damages.

161. The increased risk of infection caused by the convection currents and the resulting movement of particles in the air over a surgical site during a surgical procedure are all indicative of a design defect.

162. Defendants knew, or should have known, that the utility of the Bair Hugger device in surgical procedures was minimal because patients, such as Plaintiff, likely did not require warming during .

163. There were alternative designs on the market that Defendants knew were more advantageous and offered similar benefits, such as warming devices that used other means of providing heat to the patient and did not require forced air, yet Defendants failed to make changes or adjustments to the Bair Hugger device and continued to market the Bair Hugger as safe and effective.

164. The existence and feasible use of alternatives is further indication that the design of the Bair Hugger as an intraoperative warming device was defective, and the risks associated with its use far exceeded the perceived benefits that the design offered.

165. As a direct and proximate result of the Bair Hugger's design, Plaintiff has suffered and will continue to suffer serious physical injuries and sever pain, impairment, disability, economic loss, loss of enjoyment of life, expense of hospitalization, medical care and treatment, and other losses in an amount to be determined at trial.

**D. <u>Count IV: Breach of Implied Warranty of Merchantability</u>**

166. Plaintiff incorporates by reference all the above Paragraphs as if set forth fully herein.

167. Defendants designed, manufactured, inspected, labeled, leased, distributed, marketed, sold, and other otherwise released the Bair Hugger into the stream of commerce and are therefore deemed merchants for goods of this type.

168. Defendants, by selling the Bair Hugger, knew of the use for which the Bair Hugger was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

169. Defendants were aware that consumers, including Plaintiffs, would use the Bair Hugger for treatment in conjunction with orthopedic surgical procedures.

170. The Bair Hugger was expected to reach and did in fact reach consumers, including Plaintiffs, without substantial change in the condition in which the device was originally designed, manufactured, and sold by Defendants.

171. Defendants represented through their labeling, advertising, marketing materials, presentations, publications, and regulatory submissions that the Bair Hugger was safe and, upon information and belief, fraudulently withheld and concealed information about the substantial risks of serious injury associated with using the Bair Hugger.

172. Defendants represented that the Bair Hugger was safe and/or safer than other alternative warming devices and, upon information and belief, fraudulently concealed information demonstrating that the Bair Hugger was less safe than alternative products.

173. Defendants represented that the Bair Hugger was more efficacious than other alternative devices and, upon information and belief, fraudulently concealed information regarding the true efficacy of the device.

174. In reliance upon Defendants' implied warranties, Plaintiffs and their physicians used the Bair Hugger as prescribed and in the foreseeable manner normally intended, recommended, promoted, and marketed by Defendants.

175. Plaintiffs, other consumers, and the medical community also reasonably relied upon the judgment and sensibility of the Defendants to sell the Bair Hugger only if the product was of merchantable quality and safe and fit for its intended use.

176. Defendants breached their implied warranty to Plaintiffs in that the Bair Hugger was not adequately tested and was not of merchantable quality, safe, or fit for its ordinary purposes for which such goods are sold because the Bair Hugger was not of reasonable quality within expected variations and for the ordinary purpose for which surgical warming devices are used.

177. Plaintiffs and their physicians, by the use of reasonable care, could not have discovered that Defendants breached their warranty or the danger in using the Bair Hugger.

178. Defendants Bair Hugger device did not conform to the promises or affirmations of fact made on the container or label because it was labeled as safe for use in operating rooms, and it was not.

179. As a direct and proximate result of the Defendants' actions, omissions, and misrepresentations related to the Bair Hugger device, Plaintiff has suffered and will continue to suffer serious physical injuries and sever pain, impairment, disability, economic loss, loss of enjoyment of life, expense of hospitalization, medical care and treatment, and other losses in an amount to be determined at trial.

## E. Count V: Fraud (Pennsylvania)

180. At all times relevant to this cause of action, Defendants were in the business of designing, developing, manufacturing, maintaining, labeling, processing, selling, distributing, and marketing Bair Hugger warming devices.

181. At the time of Plaintiff's surgical procedure in which the Bair Hugger was used, Defendants developed, tested, designed, manufactured, inspected, labeled, promoted, sold, and distributed into the stream of commerce the Bair Hugger device, including the one used during the surgical procedure performed on Plaintiff.

182. At all times relevant to this action, Defendants designed, researched, developed, manufactured, tested, labeled, inspected, advertised, promoted, marketed, sold, and distributed into the stream of commerce the Bair Hugger device for use during surgeries.

183. Defendants made numerous representations as to the safety and efficacy of the Bair Hugger device, most relevantly, misrepresenting that it was safe for use during surgical procedures, including joint arthroplasty procedures.

184. At all times relevant to this cause, and as detailed herein, Defendants provided Plaintiff, Plaintiff's healthcare providers, and the general medical community with false, or incorrect, information; omitted, or failed to disclose, material information concerning the Bair Hugger device; including, but not limited to, misrepresentations relating to the safety, efficacy, failing to disclose the increase risk of infection that results from use of the Bair Hugger device.

185. Defendants falsely represented to Plaintiff, his physicians, and other members of the general public, that the Bair Hugger device was safe, fit, and effective for its intended use and fit for use in the operating room during surgical procedures.

186. The information distributed by Defendants to the public, the medical community and Plaintiff's healthcare providers, including reports, press releases, advertising campaigns, labeling materials, print advertisements, and commercial media containing material representations was false and misleading, and contained omissions and concealment of truth about the dangers of the use of the Bair Hugger device.

187. Defendants made the foregoing misrepresentations knowing that they were false and/or without reasonable basis in fact. These materials included instructions for use and warning documents that were included in the package of the Bair Hugger device that was used during Plaintiff's surgical procedure.

188. At the time the aforesaid representations were made, Defendants concealed from Plaintiff, and Plaintiff's physicians, its lack of information and consequent inability to make aforesaid representations accurately.

189. Defendants' intent and purpose in making these misrepresentations was to induce Plaintiff's healthcare providers to request, recommend, prescribe, purchase, and continue to use the Bair Hugger device during surgical procedures.

190. The foregoing representations and omissions by Defendants were in fact false. The Bair Hugger device is not safe, fit, or effective for use in operating rooms. The use of the Bair Hugger device is hazardous to the user's health, and said device has a serious propensity to cause users to suffer serious injuries, including, without limitation, the infection related injuries Plaintiff suffered. Further, the device has a significantly higher likelihood of causing infection than do other comparable warming devices.

191. In reliance upon the misrepresentations and omissions made by Defendants, Plaintiff, Plaintiff's healthcare providers, and Plaintiff's agents were induced to, and did use the Bair Hugger device, thereby causing Plaintiff to sustain severe and permanent personal injuries.

192. Defendants knew and had reason to know that Plaintiff, Plaintiff's healthcare providers, and the general medical community did not have the ability to ascertain the true facts, as compared to those that were misrepresented by Defendants, and would not have prescribed or used the same, if the true facts regarding the device had not been concealed and misrepresented by Defendants.

193. Defendants had sole access to material facts concerning the defective nature of the product and its propensity to cause serious and dangerous side effects in the form of dangerous infections in those who have the Bair Hugger device used during a surgical procedure.

194. Defendants were aware of the significant risk of infection that the Bair Hugger device posed and knew, or should have known, that the Bair Hugger device was not fit for use in Plaintiff's surgical procedure. Despite this knowledge and information, Defendants continued to represent to Plaintiff, Plaintiff's healthcare providers, and to the medical community that the Bair Hugger device was safe and effective for use in operating rooms.

195. At the time Defendants failed to disclose and misrepresented the foregoing facts, and at the time the Bair Hugger was used, Plaintiff, Plaintiff's healthcare providers and Plaintiff's agents were unaware of Defendants' misrepresentations and omissions.

196. Plaintiff, Plaintiff's healthcare providers, Plaintiff's agents, and the general medical community reasonably relied upon misrepresentations and omissions made by Defendants where the concealed and misrepresented facts were critical to understanding the true dangers inherent in the use of the Bair Hugger device.

197. The misrepresentations and omissions made by Defendant to Plaintiff's healthcare providers involved an unreasonable risk of harm to Plaintiff.

198. Defendants knew when the misrepresentations and omissions were made that the statements were false.

199. Plaintiff, Plaintiff's healthcare provider's, and Plaintiff's agents' reliance on the foregoing misrepresentations and omissions by Defendants were the direct and proximate cause of Plaintiff's serious physical injuries, impairment, disability, economic loss, loss of enjoyment of life, expense of hospitalization, medical care and treatment, and other losses in an amount to be determined at trial.

**F. Count VI: Unjust Enrichment**

200. Plaintiff incorporates by reference all the above Paragraphs as if set forth fully herein.

201. On September 16, 2014, Plaintiff was sold a Bair Hugger blanket for use with the Bair Hugger warming system during her knee replacement surgery. The Bair Hugger blanket and warming unit were designed, manufactured, marketed, and distributed by Defendants.

202. Upon information and belief, Defendants continued to legally own the Bair Hugger warming unit.

203. Defendants continued to maintain the Bair Hugger warming unit. Said unit was in the same or substantially the same condition as when it was manufactured.

204. The Bair Hugger device is defective in that it failed to contain an adequate warning about risks that were known to Defendants regarding infections.

205. The defective condition of the Bair Hugger was a substantial contributing factor and legal cause of the injuries sustained by Plaintiff. She is entitled to recover damages as allowed

by law. Defendants, as manufacturers and distributors of the Bair Hugger, are strictly liable for the injuries and losses described in the subsequent paragraphs.

## VII. PROXIMATE CAUSE AND DAMAGES

206. Plaintiff incorporates by reference all the above Paragraphs as though fully set forth herein.

207. The negligence of the Defendants proximately caused the injuries and damages made the basis of this lawsuit.

208. As a direct and proximate result of Defendants' negligence, acts and/or omissions described herein, Plaintiff seeks to recover damages provided by law that include, but are not limited to:

a. past, present, and future physical pain and suffering;
b. past, present, and future mental anguish;
c. past, present, and future physical disability;
d. past and future reasonable and necessary medical bills;
e. exemplary damages against Defendants;
f. lost wages, income and/or profits resulting from his inability to work; and
g. other economic damages caused the acts and/or omissions described herein.

209. Plaintiff further seeks any other relief in law and equity to he may be entitled.

## VIII. PUNITIVE DAMAGES AGAINST 3M COMPANY

210. Plaintiff incorporates by reference all of the above Paragraphs as though fully set forth herein.

211. No later than the time of the original 510(k) application to the FDA in the late 1980s, 3M was aware of the potential risk of airborne contamination and infection.

212. No later than the time of the original 510(k) application to the FDA in the late 1980s, 3M limited the indication for use of the Bair Hugger to areas expressly excluding the operating room.

213. No later than the mid-1990s, 3M received reports that various clinicians had concerns that the Bair Hugger generated particles, and that those particles were capable of carrying bacteria and causing infections in surgical patients.

214. Since 2003 3M has been aware of various research papers and peer reviewed studies confirming Bair Hugger machines were routinely contaminated with bacteria.

215. Since at least 2011, 3M has been aware of peer-reviewed epidemiological evidence that use of Bair Hugger is associated with a 380% increased risk of deep joint infection in joint replacement surgery patients.

216. When a manufacturer of a medical device identifies a potential safety issue related to the use of the product it has the right to initiate a variety of corrective and preventive measures, including changes to the warning label and/or instructions for use.

217. In this instance, even though 3M was well aware of the potentially life-threatening complications associated with PJI in joint replacement patients, 3M chose not to change the label of the Bair Hugger to stop the use of the Bair Hugger in total joint replacement surgeries by stating Bair Hugger was contraindicated for use in such surgeries, which would have prohibited the use of Bair Hugger. Instead, when 3M expanded the intended use of the Bair Hugger to include the operating room in the early 1990s, 3M chose to remove the warning about the risk of airborne contamination.

218. 3M knew or should have known that an increase in particulate count over the sterile fields is directly correlated with an increase in risk of PJI. Indeed, no later than 2014, 3M knew that for every 10 CFU increase per meter$^3$ the risk a patient will develop a PJI doubles.

219. Defendant 3M knew that all studies, both internal and external, showed that when the Bair Hugger was turned to warm, there was an increase in the number of particulates over the

sterile field. 3M's corporate representative testified to that fact in March of 2017 (before Plaintiff's surgery).

220. Defendant 3M knew or should have known that physicians and healthcare providers rely on 3M to provide adequate warnings and instructions for use of the Bair Hugger. 3M also knew that if it indicated on its label that Bair Hugger was contraindicated for use in total joint replacement surgery, which would stop the use of Bair Hugger in such operations.

221. Defendant 3M knew that physicians and healthcare providers, particularly orthopedic surgeons, are concerned about any device that increases particulates in the operating room, given their correlation with known infection risk. 3M testified to this via corporate representative deposition as follows:

> Q. You would agree that surgeons, especially orthopedic surgeons, would opine that if you increase particles over the surgical site you increase the risk of infection?
>
> A. I would agree.
>
> …
>
> Q. 3M is aware that orthopedic surgeons are concerned over the number of particles over the surgical site?
>
> A. Yes, we are aware of this.

222. Despite this knowledge, 3M never warned healthcare providers or hospitals about this fact. 3M confirmed this in a corporate representative deposition taken in April of 2022:

> Q. Until this day, 3M does not warn that the Bair Hugger may increase the amount of particulates over the sterile field, correct?
>
> A. That's correct

223. The acts and omissions of Defendant 3M described above cannot be construed as ordinary negligence, inadvertence, or simple mistakes in judgment.

224. The acts and omissions of Defendant 3M described above constitute a culpable state of mind because 3M's behavior related to the Bair Hugger reveals a reckless indifference to the rights (and safety) of others.

225. Prior to the execution of the Partnership Program Agreement, 3M made affirmative statements that created a false impression that Bair Hugger forced air warming devices were safe, effective, and appropriate for use in an operating room, including during all orthopedic surgeries, including Ms. Boncher's. Defendant 3M knew these statements were false. Evidencing Defendant's knowledge of the falsity of its claims, Defendant 3M testified via 30(b)(6) depositions as follows:

> Q. Yes. Okay. And 3M is aware that every single study that looked at this issue shows an increase of particulates in absolute numbers when the Bair Hugger is used, correct?
>
> A. Yes.
>
> ….
>
> Q. 3M is aware that particles can carry bacteria. Correct?
>
> A. They can
>
> …
>
> Q. And the company was aware that the Bair Hugger was generating heat, hot air; that hot air is going to rise and form thermal plumes; that the hot air was going to - can carry particles and bacteria; and that surgeons wanted to reduce bacteria over the surgical site, correct?
>
> A Yes, we're generally aware of all of that. Yes.
>
> …

Q. And 3M is aware that anything that increases particles over the sterile field increases the risk of infection for orthopedic surgeries?

A. It depends on the size of the particles and many things, but in theory you are correct, that any increase in particles is tried to be minimized.

…

Q. Because an increase in particles is related to an increased risk of infection. Correct?

A. As I mentioned, it depends on the size of the particles, but in theory you are correct.

…

Q. Until this day, 3M does not warn that the Bair Hugger may increase the amount of particulates over the sterile field, correct?

A. That's correct

In fact, 3M knows there is no evidence that the Bair Hugger is safe. In October of 2022, 3M's own epidemiological expert, Dr. Jonathan Borak confirmed this live at trial in a Bair Hugger case, testifying as follows:






226. Despite knowledge that its statements were false and its conduct was misleading, 3M failed to correct the false impression left by its statements and conduct that use of a Bair Hugger in the operating room was appropriate for every THA patient and every THA surgery. 3M was aware that the Bair Hugger was useless for use on obese patients, like Ms. Boncher. Defendants testified to the following via 30(b)(6) depositions:

> Q. All right. And you know that in 2018, in the initial draft of the ERAS sort of best practices recommendation, they suggested not using force-air warming anymore, fair?
>
> A. So ERAS is a group of surgical specialties, and I think they're up to about, I don't know, 16 of them now, something like that; so orthopedics, cardiac, gynecological, breasts, neuro. And each one of those surgical specialties writes its own ERAS protocol; there are numerous ERAS protocols. And so whenever I present on ERAS, I have a comprehensive chart that shows which surgical specialty recommends the use of warming. So, for example, bariatric surgery, they don't recommend any warming at all.
>
> Q. Okay. Is that because it's a dirty surgery or what?
>
> A. No, it's because obese people don't get cold in surgery, so obesity is protected from hypothermia. But then, you know, almost all of the other specialties - I think there's one other specialty that doesn't recommend it. But all of the other ERAS surgical specialties, the vast majority of them recommend warming and forced-air warming.
>
> …
>
> Q. So if obese patients don't get cold, is there a warning or a precaution on the Bair Hugger at all saying you don't need to use this with obese patients?
>
> A. No.
>
> Q. Why is that?
>
> A. Well, it's not contraindicated. It's just not indicated, because it's not necessary.

…

Q. But also If a patient isn't going to become cold because they are obese, there's also no benefit to using the Bair Hugger, fair?

A. Yes, I would agree with that.

This information was never shared with medical professionals.

227. Moreover, Defendant 3M engaged in a campaign to undermine, minimize, and malign individuals and groups that published information tending to show that Defendants' products increase the risk of surgical site infection when used in an operating room during total knee arthroplasty surgeries, such as Ms. Boncher's. Defendant 3M conducted that campaign for the purpose of perpetuating the false impression created by Defendant 3Ms' affirmative statements about the safety and efficacy of its Bair Hugger products. For example, 3M's agents edited every line of the International Consensus on Periprosthetic Joint Infections 2018 findings. A fact not disclosed in the findings themselves.

228. Defendant 3M's statements, which it knew to be untrue, and its conduct, created a false impression of fact that led to the execution of the Partnership Program Agreement. 3M provided one or more Bair Hugger units at the hospital pursuant to the terms of the Partnership Program Agreement. Those Bair Hugger units were used during orthopedic surgeries, including Ms. Boncher's surgery. The hospital charged patients for that service and for the use of disposable goods such as blankets.

229. The Defendants' false statements had a direct effect on Ms. Boncher's pecuniary interest. 3M Bair Hugger products, including a heater unit and disposable blanket, were used on Ms. Boncher during surgery. Ms. Boncher was charged for the use of those products and/or services.

## IX. INTEREST

230. Plaintiff also seeks prejudgment interest, court costs, and post judgment interest at the maximum amounts allowed by law.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff seeks judgment in her favor, against Defendants, jointly and severally, for compensatory damages, punitive damages, and for costs and together with any and all additional relief deemed just and appropriate by this Court, including interest on any sum awarded.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

Respectfully submitted,

By: *_/s/ Gabriel A. Assaad_*
Gabriel A. Assaad
Texas Bar No. 24076189
MCDONALD WORLEY, P.C.
1770 St. James Place, Suite 100
Houston, TX 77056
Telephone: (346) 509-7190
Fax: (713) 523-5501
gassaad@mcdonaldworley.com

Daniel J. Sheery, Jr., Esquire
EISENBERG, ROTHWEILER, WINKLER,
EISENBERG & JECK, P.C.
1634 Spruce Street
Philadelphia, PA 19103
Telephone: (215) 546-6636
daniel@erlegal.com

Kyle W. Farrar
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, TX 77008
Telephone: (713) 221-8300
kyle@fbtrial.com

Michael V. Ciresi
Jan M. Conlin
Michael A. Sacchet
Bibeana Metsch-Garcia
CIRESI CONLIN LLP
225 South 6th Street, Suite 4600
Minneapolis, MN 55402-2015
Telephone: (612) 361-8201
mvc@ciresiconlin.com
jmc@ciresiconlin.com
mas@ciresiconlin.com
bmg@ciresiconlin.com

Genevieve M. Zimmerman
MESHBESHER & SPENCE, LTD
1616 Park Avenue
Minneapolis, MN 55404
Telephone: (612) 339-9121
Fax: (612) 339-9188
gzimmerman@meshbesher.com

**ATTORNEYS FOR PLAINTIFF**